Our third case for this morning is United States v. Brian Thurman. Ms. Gambino. Good morning Judge Wood, Judge Ripple, and Judge Connie. It's my privilege to be here this morning on behalf of Mr. Brian Thurman. There were four issues raised in our briefs. I intend to focus my efforts on two of those issues. The first of which is whether government agents may search a cell phone without a warrant when there is evidence that the defendant declined to give consent, and whether the district court erred in denying his motion to suppress on this issue. And we start out, of course, with the Supreme Court's decision in Riley where they clearly stated that our answer to the question of what police must do before searching a cell phone seized incident to arrest is accordingly simple, get a warrant. But the court in Riley, of course, doesn't say you always have to have a warrant. One of the most well-established exceptions to the warrant requirement is consent. And I guess I want to ask you, in the way you phrased the issue before us, whether you think as long as there's some evidence of lack of consent, one has to go get a warrant, or whether if there is some evidence of lack of consent and some evidence that consent existed, the district judge can make a determination whether consent was effectively given and rule accordingly. Obviously, if no consent, then bad search. If yes consent, then okay search. Well, Your Honor, I think in this particular case, it's a very difficult issue. Well, to answer your case generally, I think that in the case where the question of consent is in question, that the error should be in favor of the defendant rather than in favor of law enforcement. But why can't the district judge resolve the fact? I mean, so it's just a question. Was there consent? Isn't that a factual determination? It is a factual determination, Judge. But I think courts have been, following Riley, particularly cautious in the case of cell phone searches because of the sensitivity involving the vast array of data that's available in a cell phone. And so I think that both the Supreme Court, this Court, and other circuits have been particularly cautious when addressing the appropriate way to deal with a cell phone search. And in this particular case, it's far from... Do you have any cases that say that the consent issue is handled differently if it's a cell phone search? I mean, a home is a very sensitive place, too. The Supreme Court tells us it's the core of the concern for the Fourth Amendment. And yet consent to search a home is effective if it exists. That's true. But the Court, interestingly, in the Supreme Court, and also the Fifth Circuit and the Ninth Circuit, in looking at this, have pointed out that the search of a cell phone encompasses even more data and information than a person would ordinarily keep. But that's not a surprise to anybody, is it? No, no, it's not a surprise to anyone. But I think I should point the Court to the particular facts of this case and why the District Court erred in the decision that it made in this particular case. Because what we have here is an individual who was presented with a written request for consent to search a cell phone, and he refused to sign that request, understanding that he could refuse or he could sign it. He chose not to. What happened then is that the agents wrote on that form, refused to sign, but consented. That wasn't the only one, though. He's a sophisticated individual, and he used that same ploy, and every time he was asked to sign a consent, right? Well, Your Honor, I would first of all respectfully take issue with your characterization of this as sophisticated and a ploy. I mean, on the one hand, Mr. Thurman certainly is an educated man. He has a good deal of schooling, and he was involved in teaching and those sorts of things. However, he was a man who had absolutely zero experience with the criminal justice system. So ordinarily, when you talk about someone who has experience in these kinds of situations, you're talking about someone who's been through the mill once or twice before. In this particular case, what you're talking about is a man who was in his home minding his own business when the agents converged upon his home armed and held his family outside, went through, took his tenants, and held them in custody and searched the whole home and arrested him at gunpoint. So here is a man who's not used to being involved in the criminal justice system, who's been put through a traumatic experience in the first place. Yes, he knows enough when presented with a form to read it and to refuse to sign it, and that's his indication that he doesn't want them to search his cell phone. Well, no, it's not because he turned around and said, okay, go ahead and do it. Well, that's according to what the agent said. Well, and that's exactly what Judge Wood was talking about. That's the credibility of the witnesses making a factual determination. And the problem here, though, Your Honors, is that if you say, well, an agent can turn around and say, no matter what it says on this piece of paper, this other thing happened, and we're going to presume the correctness of that decision, then an individual has no Fourth Amendment protection whatsoever. Mr. Thurman did everything that he could to show that he did not want the agents to search his cell phone. He could have said no. He did say no. Well, see, you're making an assumption that the agents were lying when they said he actually, after writing this on the form, modified, let's just say, you know, changed his mind, whatever you want to say, and said, well, actually go ahead and search or, you know, search the tenant's place but only the common areas, the other things he said. And, I mean, this isn't the first case that we've seen that involves a question whether to give greater weight to a statement on one of these waiver forms that the person is refusing to waive or refusing to give consent versus oral testimony from police officers, oral testimony from the person involved, and so forth. So there is this little line of cases where the form says no consent, and if the judge thought the police officers were lying, the judge would say no. He said he didn't want to consent. He didn't want to consent. That's it. But that's not how this one worked out. So I just don't see how, without throwing out the possibility of oral testimony altogether, we can get where you need to go. Well, you don't have to throw out oral testimony altogether, but you also don't have to give, particularly in this situation where it's within the control of the agents, for instance, whether they choose to record their interaction with the defendant when they're trying to take statements from him. And in this particular case, the totality of the evidence wasn't simply that he refused to sign the form and the agent said he did. There were four agents present during the interaction. Only two of them said he refused to sign the form and then consent, and the other two, one of them couldn't remember and the other one said he wasn't present, which was contrary to the testimony of the first agent, who said everyone was present throughout the interaction with Mr. Thurman. Wouldn't it have been fishier if they had all said, yes, he definitely orally consented? I mean, it sounds like the district judge could have decided that they were being candid and those who didn't have an ability to observe didn't make any allegations. It's not that they're giving presumptive effect to the police officer's testimony. It's just that they're crediting it and it's a binary situation, right? Yes, consent, no consent. Yes, but when the weight of the evidence, first of all, when law enforcement makes certain choices so that we don't have an actual record when we could, when their own best practices now say that they must of what happened by recording the statement that they take from the defendant, when the agents can't agree about what happened and when the defendant himself did everything he could to show that he did not want to consent, first by refusing to sign the form and then by swearing that that was his intention and filing the motion in the first place, then the question becomes whether it's more important, given the vast array of data that is contained in an individual's cell phone, that you require a warrant, and that's part A. But you're asking us, I mean, we all agree, I suppose, that during the summer of 2013, the later imposed requirements for making some kind of recording, audio, video, something, were not yet in place. That's correct. But you want us to draw a negative inference against the police officers because they didn't do something they weren't required to do? No, I want you to draw that inference because they knew that that was available to them and they actually did it in the case with the first individual they encountered. And so the inference being that if they knew how to do it, they actually did it in the same case and they chose not to do it in Mr. Thurman's case, that there is a negative inference that could be drawn from that. Could or must be? Well, in this record didn't find the significance in the failure to record that you do. That's correct. But I am suggesting or asking that this court find that the court was wrong in doing so and was wrong in doing so because of the importance of protecting the contents of an individual's cell phone and their right to express their intent to invoke their right not to consent. But you know, if you're right, then had things worked out in a very slightly different way, important different way, but slightly differently, you'd be actually taking a tool away from a defendant because at least according to the account the district court credits, he signs the form saying I'm not consenting. Then he has a further conversation with the police officers and the district court indicates perhaps with some hope of cooperating, perhaps with some hope of getting a better deal. But they let him go. He goes home. He talks to a lawyer. The lawyer calls up the next day and says we're not going down that path. There isn't going to be any. But if instead the lawyer had called and said Mr. Thurman is in fact interested in cooperating, he's going to help you find some more people in this heroin ring, he might have gotten more favorable treatment. Well, the fact that the court takes the written evidence on its face and construes the facts in this case in favor of the defendant as opposed to opposed doesn't take that tool away from him. That means he can't revoke the refusal. This is all happening on the spot. He signs whatever he signs, and then he probably instantaneously thinks, well, maybe I better throw them something. Well, that's actually not what happened in this case, and because there was a year separating this arrest from when he was actually charged, that's not an issue in this case, but it could easily be. But he makes his decision to talk, according to the facts found by the district court, almost instantly after he signs the refusal to consent. I know what the charges are until a year later. I'm not worried about them. No, that's the findings of the district court, which we disagree with and which Mr. Thurman disagreed with, and I think it's a more important thing to focus on taking away from the ordinary citizen the ability to show in a reliable way that they have refused consent. The other issue with respect to consent in this case is scope, because even according to the testimony at the hearing, the permission, if the agent's statements are credited, was only for looking in the phone for phone numbers and names. They took the additional step sometime down the road of doing an entire forensic examination. So I take it they retained the phone. And when they let him go at the end of the encounter, they kept his phone? They kept his phone. And, in fact, the agent lent him his own phone to make the call to his wife to come and pick him up. So then does the scope of that consent, you can look at my phone to see the numbers and the names, apply to a subsequent search involving a forensic examination and a reconstruction of the data? Well, that was my point, though, that these days, there are very few people who think that the only thing that you find in a cell phone are the phone numbers of somebody else. There are plenty more information available, and that's certainly widely known. Certainly that's widely known, but if you're involved in an immediate interaction where an agent says, you know, we're talking about the names of somebody, can you show me in your phone, and he shows them the names or the numbers, that's not saying anything. Would you give your phone up to someone? Well, forget that. No, I won't answer that. He didn't voluntarily give up his entire phone. In fact, I'm sure he would have wanted it back, but they retained it. So then the question is, why couldn't they take the next easy step, which is to get the warrant to do the forensic examination, rather than expanding the scope of a consent? Would you agree that they would have by that time had probable cause to get a warrant? I think they certainly could have. They found probable cause to arrest him, so there was no reason to prevent them from having done so based on what had already transpired. So there are two aspects, the consent in the first instance and the scope in the second. Okay. You'll let me save your last minute? Yes, I do. Thank you. Mr. Atlusky? May it please the Court? Patrick Atlusky on behalf of the United States. I'll start with the issue that the defendant started with, which is the factual issue surrounding the defendant's consent. And I just want to clarify the sequence of events. When the defendant was being interviewed by law enforcement, law enforcement asked him if he would advise him of his Miranda rights, asked him if he'd be willing to waive them. The defendant agreed. They then presented him with a form, asked him if he would sign the form. He refused to sign the form. The handwritten refused but given consent language that's on the form was written by agents. It was not written by the defendant. And it was notated in the signature line so that the agents had a record of it. And as the court noted earlier, in this case, the district court held an evidentiary hearing to flesh out these facts, to determine, based on the testimony provided from the witnesses who were there, what actually happened. There was a factual dispute. The defendant presented an affidavit in order to obtain the hearing, but he made the decision not to testify at that hearing. That was his right, but he didn't testify, and so his version of events didn't come through. So the only people who testify are these four officers or anybody else? Correct. Only the officers. Just the four officers. And those officers all provided consistent testimony. There were some inconsistencies about who was the lead during the interview and who may have been present at certain points, and those inconsistencies the district court was presented with but nonetheless found that the officers were credible in their testimony that the defendant consented to search his phone. And that was sufficient for the agents to then go through the phone, and what happened subsequent to that was the forensic examination. Now, the forensic examination, obviously a smartphone. The defendant had an iPhone. Those devices contained a number of apps, programs, a virtual computer, and as the defendant was talking to the agents, he indicated to the agents that certain of his messages had been deleted with the CI. What's the reasonable inference that could be drawn from that is that the agents are now going to pursue that line and see if there's any data that can be recovered from that phone to retrieve those deleted messages, much the same way law enforcement may do when they search a normal computer, go into the memory, try to extract data that hasn't been written over. And the defense has tried to suggest that the defendant Did he give them his, I assume this phone must have had, iPhones normally have a password, four digits, six digits. Did he give them the passcode he must have? I don't believe there was a passcode on the phone. Wow, okay. Again, this was 2013 when these events occurred, and I don't think that they had. More trusting times, you're saying. Perhaps. But getting back to the issue, this was not a case. So, I mean, on the scope point that Ms. Gambino is making, I mean, it's one thing to stand there holding your phone and say, look, you know, I called Skinny. And quite another thing to turn the phone over and have spread out before the agents, you know, all your family photographs and vacation pictures and your, you know, games and whatever else you may have on the phone. That's true. However, the defendant knew from the facts that were established earlier that he had the ability to limit consent. When the agents were asking to go into the other buildings that the defendant had control over, he made it very clear that he was not going to let them go into other tenants' properties. He was only going to let the agents search common areas and search vehicles that were in those premises. If he had those same concerns about the contents of his cell phone, presumably he would have been the sophisticated, intelligent man that he was, smart enough to say that he didn't want them to do anything beyond what he was doing with them and could have asked for the phone back or for it to be returned. As far as we know, the agents did not indicate he asked for the phone back? That's correct. And it was the phone, they kept the phone, and then they tried to reach out to him the next day. He never answered. Unless there are any other questions regarding that issue, we didn't touch on the guideline issues that the defendant raised in their appeal. If there aren't any other questions regarding those issues, the government respectfully requests that the court affirm the conviction and sentence in this case. Okay. Thank you very much. I don't see any questions, so thank you. Ms. Gambino, you have about a minute. Thank you, Judge. First of all, with respect to getting the phone back, I don't believe it's in the record, but he did ask and the lawyer asked to have his property returned when the lawyer called the next day. Had the forensic search already taken place? No, the forensic search did not happen until months later. Why is that not in the record? Excuse me? Why is that not in the record? What you just said, it isn't in the record. Relate it about what the lawyer said. Well, what the lawyer, the call from the lawyer is in the record. I mean, they did testify that the lawyer called the next day, but it did not get as specific as returning the phone. There's nothing in the record about the phone being returned or being requested to be returned. So they just talked to the lawyer. Right. Okay. So it is also important to note, and the thing that's most troubling about this, is that a person only has one way to show that he is refusing to consent, and that was by refusing to sign the form asking for his permission. And that is opening a pretty broad door, particularly when it comes to all of the information that's available in cell phones. So we would ask that the court reverse the district court's decision. All right. Thank you very much. And you took this case by appointment, did you not, Ms. Gambino? No. No? I think you did. Our records indicate that you did. Well, if you did, we thank you very much for taking the appointment, and we thank you in any event for your arguments as well as those from the U.S. Attorney's Office. So we will take the case under advisement.